May it please the Court, my name is Randy Thompson. Together with my co-counsel Courtney Carter, we represent the County of Mille Lacs in this manner. I will be dividing my time today with Scott Knutson, who with the Court's permission will address law enforcement and to the extent the Court wants to hear it, mootness and related issues. I would like to reserve three minutes of my time for rebuttal, and I will address the 1855 reservation and why it was disestablished, the Indian Claims Commission Act and its jurisdictional statute of limitations bars, and then the doctrine of laches. Counsel, I think we should start with mootness. So have changed circumstances provided the requested relief such that there is no longer a live case for controversy? The answer, I think, Your Honor, is no. Mr. Knutson is better prepared than I am to address that issue of mootness. But I would point out to the Court that the threshold issue here, in our view, is jurisdiction. That is, does this Court have jurisdiction to even hear this case? And the Indian Claims Commission Act says that this case involving me, which is understand that the issue of whether or not the reservation exists is embedded into their claim of law enforcement interference. And that claim is barred by the Indian Claims Commission Act, which both has a statute of limitation and a jurisdictional bar. Congressional intent controls. By its plain language, the 1855 reservation was ceded and relinquished. That's the standard under McGirt. It's the first test under Solem. That the reservation was disestablished has already been addressed by two U.S. Supreme Court decisions, the 1913 decision in United States v. Mille Lacs Band, and again in 1926 in United States v. Minnesota. The current claim by the band that the reservation was not lost is barred by the jurisdictional and statute of limitations bars of the Indian Claims Commission Act. The Mille Lacs reservation was created in 1855, and it existed for nine years before it was ceded under the 1864 treaty. Now, under that treaty, the band reserved a right against compelled removal if they had good behavior under Article 12. And that led to some controversy as to the nature of their interest in the reservation, although the Supreme Court in 1913 found that, despite that, the U.S. took the position that the reservation was gone, it had been ceded. In 1889, Congress passes the Nelson Act, which expressly states it's for the complete cession and relinquishment in writing of all the title and interest of all the Chippewa reservations in Minnesota except White Earth and Red Lake. Why didn't you cite United States v. Jackson? I'm sorry, Your Honor. Why didn't you cite our decision, our most recent diminishment decision in United States v. Jackson, in which we wrote that the Nelson Act created an almost conclusive presumption of diminishment? Yes. Why didn't the district court reference that? I'm not sure why the district court didn't. Why didn't you? Did you cite it to the district court? I don't know that we did, Your Honor. We viewed this as a disestablishment case, but to address Your Honor's question, you end up in the same place, whether it's diminishment or disestablishment, because it was diminished. If you go by diminishment — If you haven't read our two opinions in Jackson, you wouldn't — if you had read them, you wouldn't say that. All right. Well, perhaps I misread them, Your Honor. I didn't. I don't intend to. I mean, so — I don't intend you to tell — I was the author of the two Jackson opinions, and so for me, this whole thing is in another universe. It's not talking about the Supreme Court decisions, which are hard to interpret and apply, which Jackson said were controlling, and which Cooley didn't even cite because it wasn't a diminishment case. Okay. All right. Go ahead. All right. Thank you, Your Honor. Now, under the Nelson Act, there were Section 6 lands that were subject to valid and existing entries could be patented. In other words, were there lands that had already been entered prior to the Nelson Act that could go to fee title with settlers? And the answer was, while that Section 6 applied to all of the reservations, in practice, it was only applied to Mille Lacs. So the term ceded and relinquished were used by Congress. With payment, it creates an almost insurmountable presumption under Rosebud. The 1993 resolution by Congress allowed lands that had been entered after the Nelson Act to be patented and were inferred to it as a former reservation. The 1998 resolution, on two occasions, described it as a former reservation and opened it entirely for settlement and sale. So whether you go by diminishment or whether you go by disestablishment, I think those things They're the same. What? They're the same thing. Right. Correct. So in 1902, the band, Congress appropriated money to get the band members who had still not removed to White Earth, to remove to White Earth in exchange for an additional payment. The agreement signed with them stated they would remove from the former reservation and take their allotments at White Earth as a condition of payment. This is why the band told the Court of Claims in 1911, and this is in their briefs, the reservation was extinguished as an Indian reservation for every purpose whatsoever and, quote, admitted that Congress had the power and did legally extinguish the Mille Lacs reservation. All land on Mille Lacs was open to settlement and sale, and all of it proceeded to feed patent except one 80-acre parcel that was allotted to a band member, and the band was even paid for that 80 acres by the 1916 Court of Claims decision. There is no case where the reservation's been settled with payment made for all of the lands, and it still remained a reservation that at least wasn't diminished, if not disestablished. Well, except for Red Lake, of course. Well, that was never ceded, Your Honor. Red Lake was never ceded. So you have the 1935 U.S. Solicitor's opinion that the Mille Lacs band had no interest in the reservation. The Constitution of the Minnesota Chippewa Tribe describes the other bands as having a reservation, but not Mille Lacs. So in 1946, you have the Indian Claims Commission with its exclusive one-time form for cases arising prior to 1946. It's extremely broad, covering both legal and moral claims, but if you don't file by 1951, you're forever barred. But everyone agreed by 1946 there was no Mille Lac reservation. The band did. The United States did. The State of Minnesota did. Department of Interior, even the Minnesota Chippewa Tribe Constitution. The ICCA encompassed these claims. The band could have and should have filed a claim by 1951 that the reservation existed. Instead, they sought additional payment for the Section 6 lands, but failed to challenge the loss of the reservation. I refer the Court to the Ogallala cases. There's a D.C. Circuit in the U.S. Army Corps case that you can't obtain review of a historical land claim otherwise barred by the ICCA by challenging present-day actions that involve the land. And under this Court's decision in the Homestake Mining case, you can't sue third parties instead of the U.S. to circumvent the ICCA. Lastly, the Doctrine of Latches, even if there is a reservation or a diminished reservation, they've lost jurisdiction over nonmembers and their fee lands by waiting over 100 years to bring this claim and try to exercise jurisdiction. Thank you, Your Honor. I reserve the rest of my time for rebuttal. Good morning. I'm Scott Knudson for the County Attorney, Eric Madour, and the County Sheriff, Kyle Burton. You're going to have to speak up for me. All right. Ed, I would like first to address the issue of mootness, which Judge Grass raised earlier. I think the question of whether or not the case is moot is answered simply by the fact that the change in statute, 626.90, which made the law enforcement agreement optional rather than mandatory, doesn't change or remove the issue in this case, which is what is the scope of the tribe's inherent law enforcement authority. Over that, there is still a dispute. There's a concrete controversy over that issue. There's also a concrete controversy over the reservation status. So for purposes of this Court's jurisdiction, it has the power to hear those issues related to the boundary and to law enforcement authority. If the Court concludes, however, that it is moot, then we would urge the Court to remand with an order to vacate the decision below, because that's the standard rule in circumstances where a case becomes moot after the district court has ruled. The other issue I'd like to address, if I could, would be the declaratory relief that the district court granted. It's our position there that the declaratory relief is inappropriate because it ultimately is an advisory opinion. It rests on hypothetical facts about what is this ban's inherent law enforcement authority. It based its decision on a standing determination that what the county attorney's opinion and protocol, the sheriff's determination to follow the protocol, was sufficient to confer standing. However, that's a very unusual procedural posture for a court to determine then to go on and say, for declaratory purposes, there's enough facts in the record to make a determination as to what the law enforcement authority of the ban is. We have not found any case where plaintiffs can bring a motion for summary judgment on standing and then get a determination on the merits of their case based on the standing ruling. So I think procedurally, it was improper for the district court to reach the declaratory relief that it did. Now, further, the standard for declaratory relief requires particularized concrete facts, not mere conjecture. And so the determination as to what the ban's law enforcement authority is still remains a hypothetical and nonfederal question. Is there a particular provision in the order that you're talking about? Well, it says that the ban's, in the declaratory relief granted at the end of the order, that the ban's inherent law enforcement authority extends through the entire extent of the 1855 reservation boundaries, and that the opinion and protocol amounted to an interference with that authority. And so that's the point we're making here, Your Honor, is that there's been no determination yet as to real interference, merely conjectural interference. And so the analytical flaw... What's the significance of the alleged overbreadth for the future? Well, it really comes down to then, again, I think we pointed out in reference to the O'Shea case, there's a federalism concern here. I'm not understanding your... I can't... I don't know if it's the mic, but I can't make out the words. All right. Well, I apologize, Your Honor. What we're saying here, though, is that with respect to the overbreadth, we're saying that declaratory relief is so broad, it really raises a federalism question. That's the O'Shea case that we referenced in our brief. Really, what it amounts to is an opportunity for the district court to supervise the law enforcement activities of the Mille Lacs County Sheriff's. All right. If you were rewriting the declaratory judgment, what would it say? We would say that it's inappropriate to offer any opinion on what is the scope of the band's law enforcement authority, that it's premature to issue any kind of order, saying that the opinion and protocol amounted to an interference with that authority. Or anything that would follow afterwards could amount to an interference with the tribal's inherent law enforcement authority should not issue. Very simply, it's too soon. We don't have the facts in the record to support any determination that there was actual interference. And therefore, the declaratory relief is premature. It should be vacated. And that's the ruling. Then what do your clients, law enforcement, what impact the next day, what impact on the operations of law enforcement, both tribal and county? Who can and can't do what under your modified judgment? Well, it would be up to the parties to determine how to cooperate. But they've had decades to do that, and they can't. They have a law enforcement agreement today that specifies what the respective obligations are. They have an operational understanding as to calling a dispatch, who's going to respond, coordinating those kind of activities. And what's the need for this lawsuit? Well, we didn't bring the lawsuit, Your Honor. The ban did. And I don't think they needed to. But they did. They wanted a determination on the boundaries, so they came up with an argument that the opinion and protocol provided sufficient injury in fact to confer standing on the ban to bring this case and get the boundary issue decided. That was something we couldn't do in 2002 when the county tried to get a determination on the existence of the reservation. So that's what the ban's point was. You've interfered with our law enforcement authority. There is injury in fact, therefore we can have standing to bring this case. So that's the point of why they brought the lawsuit to raise the boundary issue. We don't think there really is a need for the declaratory relief that was specified in the order as respects to the law enforcement authority. I'd also point out that we think the order itself goes beyond the second exception of Montana with respect to law enforcement authority. The Cooley determination that's been mentioned held that the tribal police officer had the authority to stop, detain and search an individual waiting for state law enforcement. But Cooley doesn't extend the Montana second exception to the point at which the district court says, which is the ban's law enforcement authority extends the entire 1855 boundaries and includes the authority to investigate non-members on non-fee lands. And therefore it's well beyond the second exception in Montana. And therefore it creates a situation in which the district court has the authority to investigate non-members on non-fee lands. It's a situation in which the tribal law enforcement authority has more power than what the U.S. Supreme Court envisioned in the second exception of Montana as it made clear in Strait and Plains Commerce. That exception is simply to protect the integrity of a tribal law enforcement tribe and its ability to govern its own affairs. So it went beyond what the Montana second exception would permit. If you have any other questions, I'd like to reserve my time for rebuttal. Mr. Slonim? You can raise the lectern. I think it's on the right. Yeah, there it is. You got it. Okay. Thank you, Your Honor. Mark Slonim. I represent the Appalese, the Mille Lacs Band of Ojibwe, James West, the band's police chief, and Derek Nauman, its assistant police chief. I'd like to begin with mootness and then address the merits. This lawsuit was triggered by a public safety crisis on the Mille Lacs Reservation. After the county unilaterally terminated its law enforcement agreement with the band in 2016, the county attorney issued an opinion and protocol, which on its face and as enforced by the county sheriff, prevented band officers from doing their jobs and crippled their effectiveness as a deterrent force. They were confined to trust lands and even on trust lands could not conduct traffic stops or investigative stops of state law violations or non-Indians. With drug traffickers targeting the reservation, some operating out of drug houses on reservation fee lands, and overdoses escalating, the community was in crisis. Stripped of state law enforcement authority, plaintiffs filed this case to challenge the restrictions the county had placed on the band's inherent and federal law enforcement authority. The district court held in a ruling that is not challenged here, that these restrictions comprised an injury in fact, giving plaintiffs standing to seek declaratory and injunctive relief regarding the scope of their inherent and federal authority. Those were and remain plaintiffs' only claims in this case. The case is now moved. Robertson When I look at the complaint, it seems to me that the relief sought is predicated on the finding, and I'll quote, that the boundaries of the 1855 reservation have not been disestablished or diminished, and that all lands in the reservation as established in 1855 are Indian country. So isn't that the relief that was sought? Kessler Well, the relief that was sought was the scope of our law enforcement authority, which turns on the boundary issue. Robertson It turns on the existence of the reservation, first of all. Kessler Correct, Your Honor. Robertson Without that, without any source. That's what? Kessler That's something that all parties agreed upon. Robertson That what? Kessler That the scope of the band's law enforcement authority turns on the existence of the reservation. Robertson Okay. Kessler So this wasn't a — Robertson Well, Jackson held there was no diminishment arising from — Kessler After a trial on the merits. Robertson There was a — Kessler In which a great deal of historical evidence was gathered and evaluated. Robertson There was a great deal of historical evidence — First of all, there was extensive historical evidence presented in this case on summary judgment. We had multiple expert reports, hundreds if not thousands of historical documents, and the facts presented were not in dispute, so the Court decided the case on summary judgment. But there was a massive historical record. Kennedy Well, the existence is in dispute. Is that factual or legal? Robertson Well, it's both, but the factual record was not in dispute. The ultimate legal conclusion was. Secondly, there have been at least half a dozen cases addressing the Nelson Act, and some of those cases held the Nelson Act did not disestablish reservations. Leech Lake, 32 townships in White Earth — White Earth band versus Alexander went to the Eighth Circuit. It involved the White Earth reservation, and the Eighth Circuit said all of these cases are consistent because the Nelson Act dealt with different reservations differently. So Red Lake and White Earth were diminished because of provisions in the Nelson Act that dealt specifically with those reservations. The agreements made with those bands, which specifically defined reduced reservation boundaries. At Leech Lake, at Mille Lacs, Fond du Lac, Grand Portage, there was no reduced reservation boundary defined in the agreement. There was — at Red Lake and White Earth, the areas that were diminished, there were no allotments that could be made to the Indians. At Leech Lake, Mille Lacs, if you look at the negotiations for those agreements with the bands, it was all about making allotments to the Indians on those reservations. At Mille Lacs, there was no reduced reservation boundaries. To the contrary, the band demanded to see a map of the reservation and discuss the original reservation boundaries, and no one suggested those boundaries would change. The Nelson Act provisions, providing for allotments, providing for additional lands to be reserved for the future use of the Indians, for the sale of timber lands and the opening of other lands to homesteading, those are almost identical with the provisions in the Supreme Court's cases in Seymour, in Matz, in Solem, in Parker, and in all of those cases, the Supreme Court said there was not sufficient evidence of disestablishment. Opening a reservation and making allotments to the Indians, as this Court held in City of Newtown, is entirely consistent with continued reservation status. So there are different results as to different reservations under the Nelson Act, but the body of law that's been created recognizes that on the reservations where allotments were to be made to the Indians, those reservations were not disestablished. They were not diminished, and there's an interesting contrast, Your Honor. If you look at the railroad statute that was at issue in USB Jackson and you compare it to the 1890 railroad statute for the Mille Lacs reservation, passed within six months of the Nelson Act, it refers repeatedly to allowing for a right-of-way and taking of lands within the limits of the Mille Lacs reservation. It says that those lands... Was that a right-of-way or an expanded right-of-way? It was an initial right-of-way. Right. That's different. Initial right-of-way. Very, very different. But it's more consistent with the existence of a reservation than the statute in Redby, which this Court held, which in your opinion, held did not diminish that reservation. Those lands in the Mille Lacs case could not be used for town site purposes under the statute, and once they were no longer used for a railroad, they would revert to the Mille Lacs band. That's pretty clear evidence that Congress thought the band had a reservation and that it would have a continuing interest in that reservation. Okay. A couple of questions that are just in the nature of the title to this land generally. It can't be aboriginal land because it's not been held by the tribe from time immemorial because they started off east and were moved west during the relocation, right? So it's got to be something that was created by treaty and agreement, right? And so you start off with the 1855 treaty, and then you have the 1863 treaty, and if you look at the language of the two treaties, the question I've got is that there's the ceded language, which standing on its own is not sufficient because there's been litigation and all sorts of treaties that have that language, or they said that's not a cleared disestablishment, right? So what you look at is say, well, what in the world is this promise that you get to retain the right of possession and cannot be compelled to remove so long as you do not in any way interfere or molest persons or properties of whites, right? What is that? And is that a reservation of an interest in land that's now being occupied, so it sort of looks like aboriginally titled land, but it's not? Or is it still the reservation still exists? You can't be removed from where you are because of the language of the 1863 treaty. And I know what your position is. What I'm trying to figure out is that do you have a case where there's anyone similarly situated who has been confronted with this same kind of a conundrum? The cases we think that are most closely analogous, there's three of them, and they're a little different in their fact patterns. But the first one is Minnesota v. Hitchcock, where the Court said if you have an area of land, even if the United States holds fee title to that land, if it's reserved for Indian occupancy, that's a reservation. And that's essentially what we had with the good behavior condition, but we had an area of land that presumably the United States held fee titles because of the session in Article I, but the Indians had a right to stay there and occupy that land. And so that reserve for occupancy is not conditional on the conditional nature of it, on continued good behavior and not molesting the rights of others, does not in any way diminish the title and nature of the title or the boundaries of the reservation. I don't think so until that condition is triggered, Your Honor, which never happened. Right. Then the other cases that I would point to are two Supreme Court decisions that are contemporaneous with these treaties. 1857 is Fellows v. Blacksmith, and 1867 is the New York Indians case. And those cases dealt with seated. You've got to say it. I'm sorry. You've got to say it slower. Sorry. I couldn't begin to make out the names that you just said. 1857 is Fellows v. Blacksmith. Okay. And 1867 is in re New York Indians. Those cases dealt with seated reservations. Fellows v. Blacksmith dealt with how do the Indians get removed once they've seated a reservation, and the Court said only the Federal Government could do that. You can't have individuals coming in and claiming lands and parcel by parcel taking lands from Indians and kicking them off the reservation. New York Indians said that what Fellows v. Blacksmith stands for is that when a tribe cedes its reservation, until it's removed in accordance with treaty stipulations, it retains all its rights in that reservation. And that's what we have here. Except that the treaty stipulation says they can't be removed. So they've seated the reservation, but they can't be removed until this condition is triggered. So New York Indians says they have all their rights during that period of time. And that's something more than the mere right of possession, which I think is what the argument generally is, is that whatever the tribe owns, they no longer own it as a reservation. They just own the right to possess the land as a result of the 1863 treaty. Yeah, well, they have a treaty right to remain and occupy that land, and that's equivalent to a reservation. Yeah, well, and that's the whole thing. The whole usurpatory nature of those relationships are always kind of tough, right, because it's not a land tenancy that's ordinarily found in the United States, right? You've got the government holding the fee, the tribe holding the usurp. And, you know, outside of Louisiana and oil interests, it never comes up. In the Court of Claims decision in 1912 in the Mille Lacs Claims case, the court did look into this, and they said this isn't a mere hunting and fishing right. It's not a mere usurpatory right. It's a right to live on these lands. Yeah, there's a possessory interest plus the right to use and to hunt, fish, and use the minerals, I presume. Right. Right. The whole – I think they have the right to do whatever they were doing and to live on and occupy those lands. Until that condition was triggered, and it was never triggered. Okay. I'm going to double back to Moot this for a second. Because this case is like super moot. I don't know if that's a legal term. But the restrictions that we challenged in this lawsuit ended in 2018, and there's no realistic prospect that they're going to recur. When the parties entered into a new law enforcement agreement in 2018, the county attorney withdrew his opinion and protocol, and the band's police officers resumed their normal operations with no restrictions from the county. Indeed, at that time, it was defendants that argued that plaintiff's law enforcement claims, which, again, are our only claims in this case, were moot. The case continued only because, as defendants insisted, the 2018 agreement was a temporary agreement that would terminate following the conclusion of this case, creating a realistic possibility that the restrictions would be reimposed if the case were dismissed. And that was the whole basis for Judge Nelson's ruling that there was no mootness here, was that it was only a temporary agreement that resolved the law enforcement issue at that time. And she said the same thing on an initial motion we filed, which is in the record document 217, and then after the remand from this court after the first appeal, she reintegrated that finding. She didn't deny that the law enforcement issue had been resolved. She said it could revive itself once that agreement went away. Well, the recent amendment to Minnesota Statute Section 62690 removes that possibility by conferring broad State law enforcement authority on the band's officers, even in the absence of an agreement with the county. So the band now has more law enforcement authority than it's ever had as a matter of State law. And anything that it sought to do with its inherent authority when we lost State authority, it can do with the State authority it has now. And the county can't change that. If it wants to revoke the current agreement, it can revoke it, but it doesn't make any difference because the State statute now confers the same power on the band's law enforcement officers as the sheriff has, and it's throughout the 1855 reservation boundaries. The statute is explicit as to that point. So we have full law enforcement authority throughout the reservation. Our problem has been solved, and it's been solved on an essentially permanent basis by the withdrawal of the restrictions that the county imposed and by this amendment to the State law. So there's no continuing injury. As this Court held — Let me ask you a question about that. So a State statute can delegate the State's police powers, but can it have any impact on the sovereign authority of the tribe outside of Indian country? No. I don't believe it can. Is that the relief that was requested in the complaint? The relief that — that was the relief we sought because we didn't have the State authority at that time. Now that we have the State authority, the lesser authority that we're claiming for — in terms of our inherent sovereignty, which is not as broad-reaching as the State authority, is — doesn't matter because we have the State authority. The defendants, when they were arguing Moot Dis, said that the Federal authority is merely hypothetical. Those questions are merely hypothetical once the State authority is reinstated. And it's been reinstated, and it can't be taken away by the county. So I — we don't get anything from resolving inherent authority questions now that we have this State authority. If that's the case, then why do you want to keep the district court opinion in place? Okay. Next question on vacator. And let me just — before talking about vacator, the two cases that I think are most on point on Moot Dis are Whitfield v. Thurston and Sisney v. Kamik, which says that the plaintiff's injury has to continue throughout the case to maintain an Article III case or controversy. And we have no injury anymore. There's — the county isn't doing anything to us. Law enforcement is operating fully. There just is no more injury. On vacator. As this Court explained in Moore v. Thurston and South Dakota Voice v. Nome, vacator is an equitable remedy that turns on considerations of fault and the public interest. As the party is seeking vacator, defendants bear the burden of showing an entitlement to that — this extraordinary remedy. Defendants — It's not extraordinary. That's what the Supreme Court said, Your Honor. I'm just quoting from the — from U.S. Bank Corps. And I think it's reiterated in one of this Court's decisions, but I'm not positive right now. Defendants' withdrawal of the restrictions that gave rise to this case in 2018, ending the injury on which plaintiff's standing was based, is one of the principal reasons the case is now moved, as defendants themselves previously asserted. And indeed, the case would have ended in 2018, but for defendants' insistence that the 2018 agreement terminate once this case ends. As the Supreme Court put it in U.S. v. Bank Corps, if I may, the denial of vacator is merely one application of the principle that a suture's conduct in relationship to the matter at hand may disentitle him to the relief he requests or seeks. Moreover, as in Moore and South Dakota Voice — What impact does the non-vacated judgment have on the reservation existence issue? It stands as a precedent of the district court for whatever value that precedent may have. So does it take a position? Well, the district court — Does it articulate what you've said this morning is the obvious reason why the reservation exists? Yes. So that is a strong reason, in my view, to vacate that issue. I mean, these Supreme Court diminishment cases, I think there were seven of them, the first Jackson opinion. They're four to three, and they're irreconcilable in reasoning. They start with a result, and then they find a legal way to reach it. Well, Parker was unanimous. Pardon? The Parker decision, which — Cases are split four and three as to who — Oh, I see. I see. It wasn't that they were divided. I'm sorry. The real issue is if there's a division in our court, you know, whatever. A district court opinion, I haven't been a district judge for a long time. I know it's not worth the paper it's printed on, except as between the parties generally. But at the end of the day, it sits out there in the world existing with some precedential value. And if our panel was divided over what's the meaning of the law, isn't it a lot easier and better to say rather than us to leave this district court opinion stand there, we're going to vacate it because it just causes less harm to the system. The issues live, and then the day comes where they're ripe and you can bring them again, maybe on a better developed record. I think the vacater issue is probably the closest issue in this case. I think there's some value in leaving the district court's decision in place for the reasons the state articulated about providing guidance to federal and state agencies, including to law enforcement and prosecutors. We don't think it's binding on the county. If there's another case or controversy that's a live Article III case, they can relitigate the issue. I know you never want to give up a win, but I'm just trying to see what its real value is in the world, right? Yeah, and I think the guidance it provides to other parties has some value. This isn't a result we sought. I mean, we had a law enforcement crisis. We brought this lawsuit to address that crisis. We pursued this case diligently at every step of the way. The circumstances have changed, and we think it's very much moot at this point. It was our obligation to inform you about that, regardless of the consequences. We've done that. We think the better course is not to vacate, but I recognize that there are countervailing considerations on that issue. Thank you. And my time's up. Thank you, Your Honor. Let me address a couple of the issues as quickly as I can. The decision in McGirt controls as to what congressional intent was regarding the Mille Lacs Reservation. The decision in what? McGirt. McGirt for Oklahoma. With regard to your questions regarding 1864 Treaty. In fact, what ends up happening is they are removed from the Mille Lacs Reservation. They relinquished that right under the Nelson Act. There were subsequent congressional resolutions, and then the appropriation and agreement to remove to White Earth in exchange for payment. So it went beyond what had occurred in 1864. But there's a group of people that did not relocate to White Earth and continued to make a claim of right of possession and stayed where they were. Does that matter at all? No, that's not correct. They all agreed to remove as a condition of payment. Some may have come back. There was no physically forcing them off, but the vast majority went to White Earth. But weren't there 500 people that stayed? Well, no, not that many. Some came back later. Oh, is that what it is? Yes. They got allotments of White Earth. They may have sold them and come back. There was no law enforcement crisis. There were more law enforcement officers during the period of time because the sheriff increased his coverage, and the band officers continued to conduct traffic stops, and those matters continued to be prosecuted. This idea that they proved anything in district court is simply wrong. There was no law enforcement crisis. With regard to mootness, and I think this is one of the questions the court has, the state statute only covers state law enforcement authority. Inherent law enforcement authority does not apply to civil regulatory matters by the band. Okay? So if you don't decide this issue on mootness, there will be a question about can band officers exercise civil regulatory authority under state law over band members outside of trust lands. The same question the sheriff is dealing with today. That issue is not resolved. This case is not moot. This case is about inherent law enforcement authority, not state law enforcement authority. My time is up unless you have further questions for me. Thank you, Counsel. Thank you, Your Honor. The cases are complex. They've been thoroughly briefed and well argued, and we will take them under advisement and do our best.